IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 05-227 |
| | ) | |
| JOHN FOCARETA, | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

Defendant John Focareta ("defendant" or "Focareta") was indicted on August 2, 2005 on

one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

Pending before this court is a motion to suppress evidence filed by defendant on December 9,

2005. (Doc. No. 21).   In the motion to suppress evidence, Focareta seeks to suppress a .45

caliber Taurus pistol, a pipe commonly used for smoking marijuana, and a baggie containing

marijuana seized on July 3, 2005.  On December 27, 2005, the government filed a response to the

motion to suppress.  A suppression hearing was held on April 3, 2006 and April 12, 2006.

Defendant and the government submitted proposed findings of fact and conclusions of law and

the record was closed on June 23, 2006.

On this 25th day of July 2006, the court makes the following findings of fact and

conclusions of law with respect to defendant's motion to suppress evidence:

## I.      Findings of Fact

1.      On July 3, 2005, Plum Borough Police Officers Michael DeMarco ("DeMarco") and

        Joseph DiMaria ("DiMaria") were on duty.  Transcript of April 3, 2006 Suppression

        Hearing ("Tr. 1") at 8.

2.      DeMarco has been a Plum Borough police officer for around two years and nine months. Tr. 1 at 7.  DeMarco was a part-time police officer for the Edgewood Borough and Swissvale Police Departments for around two and a half years prior to his employment with Plum Borough.  Tr. 1 at 7.

3.      DiMaria is also employed as a police officer with the Borough of Plum.  Tr. 2 at 2. DiMaria has been employed as full-time Plum Police Officer for approximately a year and a half.  Tr. 2 at 2.  Prior to his employment in Plum, DiMaria worked as a police officer, on both a full-time and part-time basis, for the Borough of Swissvale for four years.  Tr. 2 at 3.

4.      At approximately 2:46 a.m. on July 3, 2005, both DeMarco and DiMaria while on duty were in uniform and operating in marked Plum Borough police vehicles.  Tr. 1 at 8; Transcript of April 12, 2006 Suppression Hearing ("Tr. 2''") at 5.  DeMarco was on patrol in a marked vehicle, monitoring traffic at the intersection of Entrance Drive and Logan's Ferry Road.  Tr. 1 at 8-9, 30.  DiMaria, also in a marked vehicle, was located to the immediate right of DeMarco's marked vehicle, at the same intersection.  Tr. 1 at 8, Tr. 2 at 4.  DeMarco's car was facing towards the Allegheny River.  Tr.1 at 12.

5.      Blair Auto Sales ("Blair's") is located at 132 Coxcomb Hill Road and is approximately three to four hundred feet from the spot occupied by DeMarco and DiMaria on July 3, 2005.  Tr. 1 at 9; Government's Ex. 2.  Blair's is a low-end, used car dealership.  Tr. 1 at 19; Tr. 2 at 6.  Cars are sold in the price range of one hundred dollars to the low thousands of dollars.  Tr.1 at 20.  There is an access road, adjacent to railroad tracks, that runs behind Blair's.  Tr. 1 at 12-13; Government's Ex. 2; Defendant's Ex. F.  The access

road is not paved, but made up of gravel and rocks.  Tr. 1 at 14.  The road does not appear to be constructed for regular vehicular use.  Tr.1 at 16.  Blair's was closed during the time of this incident.  Tr. 1 at 84.  From DeMarco's perspective at 2:46 a.m. on July 3, 2005, Blair's was located across the street and to the left. Tr. 1 at 9.

6.      DeMarco had responded to calls of criminal activity at Blair's before on several occasions.  Tr.1 at 18-19.  DeMarco and DiMaria were aware that other officers had been called to Blair's.  Tr. 1 at 18-19; Tr. 2 at 6-7, 62-63.  Incidents of car theft have been reported by Blair's.  Tr.1 at 18-19, 75; Tr. 2 at 6-7.  In addition, there were also reports of thefts of firearms from Blair's.  Tr. 1 at 18-19; Tr. 2 at 6-7.  Reports of cars being broken into, windshields destroyed, and registration stickers being stolen were commonplace.  Tr. 1 at 18-19; Tr. 2 at 6-7.

7.      While DeMarco and DiMaria were stopped at the intersection of Entrance Drive and Logan's Ferry Road, DiMaria noticed headlights on the road behind Blair's.  Tr. 1 at 12; Tr. 2 at 5.  DiMaria and DeMarco were both facing the river and Blair's Auto.  Tr. 2 at  4.  DiMaria told DeMarco that it appeared to him that someone was either pushing or driving a car behind the parked cars at Blair's.  Tr. 2 at 6.  DiMaria suspected that someone had broken into one of the cars in the lot at Blair's in order to steal it.  Tr. 2 at 7.  DiMaria did not specifically see any person trying to push a car out of Blair's or anyone walking through the weeds around Blair's.  Tr. 2 at 40.  The lights of the car, as observed by DiMaria, indicated that the car was traveling away from Blair's.  Tr. 2 at 8.  DeMarco, upon being informed of DiMaria's observation, proceeded to make a left-hand turn out of Entrance Drive and traveled on Logan's Ferry Road toward Blair's.  Tr. 1 at 13, 42-43.

After arriving in front of Blair's, DeMarco made a right hand turn behind the building and proceeded to drive on to the access road next to the railroad tracks.  Tr.1 at 13-14, 42-43.

8.    At this time, neither DeMarco nor DiMaria had information that Focareta was wanted by the police, that a red Lexus was wanted in connection with any criminal activity, or that there was any criminal activity occurring at Blair's.  Tr.1 at 39-40.

9.    As DeMarco made his way towards Blair's, DiMaria drove his vehicle across Entrance Drive, onto Logan's Ferry Road and stopped his vehicle in the lane of traffic.  Tr. 2 at 8. DiMaria then exited his vehicle.  Tr. 2 at 8.  DiMaria proceeded to walk down a footpath near a sign for the Logan's Ferry Volunteer Fire Department.  Tr. 2 at 9.  At the end of the path, DiMaria was located on a gravel path next to the train tracks that run behind Blair's. Tr. 2 at 9.

10.    After traveling approximately 250 to 300 feet on the access road, DeMarco observed two males on the access road walking toward Blair's and away from a red Lexus automobile. Tr.1 at 15, 45.  The Lexus was about forty feet in front of DeMarco's vehicle and the two men were closer–walking towards DeMarco.  Tr.1 at 47.  The Lexus did not have its lights on and the ignition was turned off.  Tr.1 at 48.  At the suppression hearing, held on April 3, 2006, DeMarco identified one of the two males as the defendant.  Tr. 1 at 22. DeMarco stopped his vehicle about halfway between the Blair's building and the location of the red Lexus.  Tr.1 at 15-16.  The two men were about twenty feet from the red Lexus and walking toward Blair's.  Tr.1 at 16.

11.   As DiMaria cleared the footpath and approached the railroad tracks, he noticed a vehicle stopped about 15 to 20 feet to his left.  Tr. 2 at 9, 38.  The headlights on the vehicle were off.  Tr. 2 at 10.  DiMaria noticed DeMarco's police vehicle 60 to 70 feet to his left.  Tr. 2 at 10.  The overhead takedown lights on DeMarco's vehicle were activated.  Tr. 2 at 10, 41.  DiMaria observed two individuals silhouetted in the lights.  Tr. 2 at 11, 41.  DiMaria could hear DeMarco telling the two individuals not to move their hands.  Tr. 2 at 13.  Neither individual made any movements that threatened DiMaria.  Tr. 2 at 44.

12.   Upon seeing the two males, DeMarco exited his vehicle and asked the males to stop walking towards him.  Tr. 1 at 17.  DeMarco then observed the two males reaching inside their pockets near their waist several times.  Tr.1 at 17, 55.  DeMarco instructed the two males to take their hands out of their pockets so that he could see them.  Tr. 1 at 18.  The two males failed to comply and continued reaching into their pockets.  Tr. 1 at 18.  Focareta placed both of his hands into his pockets.  Tr. 1 at 57.  DeMarco described Focareta as being dressed in a hooded sweatshirt, or "hoodie."  Tr. 1 at 57, 59.  DeMarco observed Focareta continuing to reach into the front pocket of the sweatshirt.   Tr. 1 at 57.  DeMarco proceeded to draw his weapon and order the two males to stop and place their hands where he could see them.  Tr.1 at 20, 58.  The two men responded by walking backwards away from Blair's and towards the red Lexus.  Tr.1 at 21, 85.  Both continued to put their hands into their pockets.  Tr.1 at 63.  DeMarco walked out from behind his police cruiser and again instructed the two males to stop.  Tr.1 at 63.  They failed to comply.  Tr.1 at 21, 61-62.  As the two males approached the Lexus, DeMarco ordered

5

them to place their hands on the vehicle.  Tr.1 at 22, 67.  DiMaria observed DeMarco

ordering the two men to place their hands on the trunk of the vehicle.  Tr. 2 at 14.

13.  DeMarco asks people to keep their hands raised for the purposes of his own safety and to

prevent suspects from pulling a weapon on him.  Tr. 1 at 87.  Despite placing their hands

on the vehicle in compliance with DeMarco's order, the two men continued to reach

around their waist bands and into their front pockets.  Tr. 1 at 22, 67, 70.  DiMaria

noticed that both men were not complying with DeMarco's order and yelled, "Do it" in

order to get them to comply.  Tr. 2 at 14.

14.  Focareta was located on the right, rear, passenger side of the Lexus.  Tr. 1 at 68.  Michael

Mazur ("Mazur") was on the left, rear, driver's side of the vehicle.  Tr. 1 at 68.  Neither

Focareta nor Mazur obeyed the officers' commands.  Tr. 2 at 14-15.  DiMaria observed

Focareta take his right hand off of the trunk of the Lexus and attempt to place it into his

right front pants pocket.  Tr. 2 at 14-15.  DiMaria, in his experience as a police officer,

has found that individuals most frequently conceal firearms in their waist area.  Tr. 2 at

15.  DiMaria instructed Focareta to place his hands back on the vehicle.  Tr. 2 at 16.

15.  DeMarco, due to the two men's refusal to obey his commands, placed Focareta in

handcuffs.  Tr.1 at 72; Tr. 2 at 17.  DeMarco did not pat down Focareta immediately, but

moved over to the rear section of driver's side of the Lexus and placed Mazur in

handcuffs.  Tr.1 at 23-24 Tr. 2 at 17.  DeMarco did so because Mazur was reaching into

his right front pocket.  Tr. 1 at 23; Tr. 2 at 17-18.

16.  DeMarco proceeded to do a pat-down search of Mazur.  Tr.1 at 24; Tr. 2 at 18, 48.

DeMarco felt a bulge in Mazur's front right pants pocket.  Tr. 1 Based on his training and

experience, DeMarco believed the bulge to be a controlled substance.  Tr. 1 at 24; Tr. 2 at

18.  DeMarco asked Mazur what the bulge was.  Tr. 1 at 24.  Mazur replied that it was

"stuff."  Tr. 1 at 24; Tr. 2 at 18.  Upon confiscating the item, DeMarco observed that it

was a knotted, plastic baggie containing a white, powdery substance.  Tr.1 at 25.

DeMarco and DiMaria believed, at that time, that the substance was cocaine.  Tr. 1 at 25;

Tr. 2 at 18.  No other drugs or firearms were found on Mazur.  Tr. 1 at 25.

17.  As DeMarco placed Mazur into his police vehicle, DiMaria was watching Focareta.  Tr.

1.  Upon approaching Focareta and grabbing his elbow to ensure that he would not flee,

DiMaria smelled a strong odor of marijuana.  Tr. 2 at 20, 48, 66.  DiMaria has experience

in detecting the smell of marijuana on individuals having participated in more than one

hundred arrests in which the smell of marijuana was present.  Tr. 2 at 20.  DiMaria

proceeded to pan his flashlight over Focareta's body.  Tr. 2 at 20.  The light reflected off

an object in the pouch of Focareta's hooded sweatshirt.  Tr. 2 at 20.  Upon closer

reflection, DiMaria noticed a glass pipe in Focareta's pouch.  Tr. 2 at 21, 49.  DiMaria

proceeded to seize a multi-colored, glass pipe.  Tr. 2 at 22.  Pipes such as the one

recovered from Focareta are commonly used for smoking marijuana.  Tr. 2 at 22;

Government Ex. 3.

18.  While pulling the pipe out of Focareta's pouch, DiMaria also felt a plastic baggie.  Tr. 2

at 22.  The baggie contained a substance DiMaria believed to be marijuana.  Tr. 2 at 22;

Government Ex. 4.

19.  In DiMaria's experience, it is common to find guns during a drug search.  Tr. 2 at 63.

DiMaria then asked Focareta if he had "anything else on his person."  Tr. 2 at 23, 51.

Focareta did not respond.  Tr. 2 at 23.  DiMaria did not inform Focareta of his Miranda rights prior to asking that question.  Tr. 2 at 52.  DiMaria then began a pat-down search of Focareta.  Tr.2 at 23.

20.     DiMaria felt a hard object on Focareta's right hip area.  Tr. 2 at 23.  DiMaria believed that the object felt like the handle area of a pistol.  Tr. 2 at 23.  DiMaria pulled Focareta's sweatshirt up towards Focareta's head and observed a firearm tucked into Focareta's waistband.  Tr. 2 at 23.  DiMaria seized the silver and black .45 caliber handgun from Focareta.  Tr. 2 at 22; Government Ex. 5.  A cell phone and $960 in cash was also found to be in Focareta's possession.  Tr. 2 at 24.

21.     Mazur and Focareta were placed into separate police vehicles and taken to jail.  Tr. 1 at 26.  DeMarco transported Mazur and DiMaria transported Focareta.  Tr. 1 at 26.

22.     DiMaria, after conferring with DeMarco, prepared the police report for the arrest of Focareta and Mazur.  Tr. 1 at 51.  Tr. 2 at 53.  The report states that DeMarco approached the red Lexus on the gravel road behind Blair's and stopped the vehicle.  Tr. 2 at 53.  The report does not state that two individuals were walking some distance from the Lexus, but rather that they were standing near the vehicle.  Tr. 2 at 54.  The same is true of the affidavit of probable cause attached to the report.  Tr. 2 at 60; Defendant's Ex. H.  The court notes that there are several differences between DeMarco's and DiMaria's testimony and the text of their report.  For example, the report makes reference to individuals pushing a car behind Blair's.  The report also contains some ambiguity about the exact location of DiMaria while DeMarco ordered Focareta and Mazur back to their vehicle.  This court does not find that those inconsistencies to be material and they are not

8

enough to discredit the officers' testimony.  Specifically, the court notes that there are no inconsistencies between the report and the officers' testimony regarding the defendant's furtive hand movements and his refusal to follow police instructions.

23.    Mazur testified at the suppression hearing and his recollection of the events of the early morning hours of July 3, 2005, differs markedly from the testimony of DeMarco and DiMaria.  Mazur stated that he was present in the area behind Blair's with Focareta in the early morning hours of July 3, 2005 to go fishing.  Tr. 2 at 70.  Mazur testified that, shortly after parking his car on the gravel road behind Blair's, he noticed headlights approaching him from the direction of Blair's.  Tr. 2 at 73-74.  Mazur testified that the police officer in the vehicle immediately stepped out of his car with his weapon drawn and ordered Mazur and Focareta to put their hands in their air.  Tr. 2 at 74. Mazur asserted that neither Focareta nor he, after he placed a beverage on the ground, ever moved their hands in contravention of the officer's order.  Tr. 2 at 77.  Mazur testified that DeMarco immediately handcuffed Focareta and ordered Mazur to place his hands on the trunk of Mazur's car.  Tr. 2 at 78-79.  Mazur stated that he never moved his hands off of the trunk of the vehicle.  Tr. 2 at 79.  Mazur testified that he was later searched by DeMarco and handcuffed by DiMaria.  Tr. 2 at 81.

24.    The court listened to Mazur's testimony and observed his demeanor under questioning. For the purposes of deciding this motion, the court credits the testimony of DiMaria and DeMarco and will give no weight to Mazur's testimony for several reasons.  First, Mazur testified that on the day of the incident he had been using powder cocaine for "most of the day."  Tr. 2 at 84.  Mazur noted that he purchased a quarter of an ounce of cocaine earlier

that day, but when asked from whom he purchased the cocaine, Mazur elected to invoke his Fifth Amendment right against self-incrimination.  Tr. 2 at 85, 88-89.  Second, as of the date of his testimony, a charge of possession of cocaine was pending against Mazur in the Court of Common Pleas of Allegheny County, Pennsylvania.  Tr. 2 at 68.  Finally, Mazur, despite stating that Focareta and he were in the area of Blair's on July 3, 2005, to go fishing, admitted that he owned no fishing license and brought no fishing gear or fishing rods to the scene.  Tr. 2 at 97.  Mazur testified that a friend named "Rich" was going to meet Mazur and Focareta and bring fishing equipment with him.  Tr. 2 at 97.  Mazur was unable to recall, however, Rich's last name or his telephone number.  Tr. 2 at 97-98.  Mazur also testified that, to his knowledge, Rich never showed up to meet him.  Tr. 2 at 105.  The court does note that Mazur recalled speaking to Rich in the days shortly after July 3, 2005.  Tr. 2 at 106.  Mazur stated that Rich drove by the scene of the arrest that night on Logan's Ferry Road and, upon noticing the police lights, decided to not to stop.  Tr. 2 at 106.  DeMarco observed no fishing poles, buckets, hats, or licenses in Focareta's or Mazur's possession either.  Tr. 1 at 84.  For all of those reasons, as well as the court's observation of Mazur's demeanor during testimony, the court finds Mazur to not be a credible witness and the court will not credit his testimony in deciding defendant's motion to suppress.

**II.     Conclusions of Law**

10

1.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated ... ."  U.S. CONST. amend. IV.  For Fourth

Amendment purposes, a seizure occurs when police apply physical force to the person

being seized, or, where force is absent, the person submits to the show of police authority.

United States v. Valentine, 232 F.3d 350, 358 (3d Cir. 2000)(citing California v. Hodari

D., 499 U.S. 621, 626-28 (1991)).  "Thus, if the police make a show of authority and the

suspect does not submit, there is no seizure."  Id.[1]

2.    Various courts of appeal have applied the Hodari D. standard and analyzed the behavior

of suspects after failing to comply with a police officer's show of authority as it relates to

seizures under the Fourth Amendment.  See, e.g. Valentine, 232 F.3d at 358; United

States v. Johnson, 212 F.3d 1313 (D.C. Cir. 2000); United States v. Smith, 217 F.3d 746

(9th Cir. 2000).

3.    In Valentine, Irvington, N.J. police officers Woodard and Contreras received information

from an informant that he had just seen a man with a gun.  232 F.3d at 352.  The officers

described the area in which they were located as "very bad" and an area that had recently

experienced "[a] lot of shootings."  Id.  The informant gave a description of the gunman

and the officers immediately proceeded to search for him.  Id. at 353.  About fifty to one

hundred feet north of the intersection where the informant met the police officers, the

officers noticed a group of three men standing in a parking lot, including one that

_____

[1]"Attempted seizures of a person are beyond the scope of the Fourth Amendment."
County of Sacramento v. Lewis, 523 U.S. 833, 845n.7 (1998).

matched the description given by the informant as well as another younger man.  <u>Id.</u>   The

officers, in uniform and in a marked police patrol car, stopped and stepped out of their

vehicle.  <u>Id.</u>   The three men in the parking lot all proceeded to walk away from the

officers.  <u>Id.</u>   Contreras ordered the young male to stop and he complied.  <u>Id.</u>   When the

officers asked Valentine to do the same, he responded by stating, "Who me?" and

charging towards Woodard.  <u>Id.</u>   Woodard grabbed Valentine and wrestled him to the

ground.  <u>Id.</u>   During the altercation, Woodard heard a ting and Valentine's handgun hit

the ground.  <u>Id.</u>   The government prosecuted Valentine for being a felon in possession of

a handgun in violation of 18 U.S.C. §§ 922(g)(1) and (2).  <u>Id.</u> at 352.

4.     Prior to trial, the district court suppressed the handgun on the ground that the police

officers did not have reasonable suspicion that Valentine was engaged in a crime at the

time he was seized.  <u>Id.</u>  On appeal, the United States Court of Appeals for the Third

Circuit reversed the district court.  <u>Id.</u>  at 359.  The court of appeals held that Valentine

was not seized within the meaning of the Fourth Amendment until the police physically

acted upon him by wrestling him to the ground.  <u>Id.</u>  at 359.  "Even if Valentine paused

for a few moments and gave his name, he did not submit in any realistic sense to the

officers' show of authority, and therefore there was no seizure until Officer Woodard

grabbed him."  <u>Id.</u>

5.     In <u>Johnson</u>, two Washington, D.C. Metropolitan Police Department officers were driving

in an unmarked vehicle in the Southeastern part of the city.  212 F.3d at 1314.  The two

officers described Southeast Washington as a "high narcotics area."  <u>Id.</u>  During patrol,

the two officers pulled into a parking lot.  The officers noticed a parked car in the same

lot with two people in it.  Id.  Johnson was sitting on the passenger side and another

person occupied the driver's side.  Id.  The two officers observed a young woman lean

into the passenger's side of the vehicle and hand Johnson an object.  Id.  Neither officer

could identify the object.  Id.  The two officers proceeded to exit their vehicle and

approach Johnson's vehicle.  Id. at 1315.  The woman near Johnson's window began to

walk away.  Id.  As they approached the car, one of the officers, Michael Fulton

("Fulton"), noticed Johnson make a "shoving down" motion.  Id.  This led the officer to

believe that Johnson may be armed.  Id.  Fulton, along with his partner, drew his gun and

shouted, "Let me see your hands."  Id.  Johnson did not comply with this order, but rather

continued to make more "shoving down motions" before finally raising his hands.  Id.

Fulton reached into the car and felt a bulge in Johnson's left pants pocket.  Id.  Fulton,

based on his training and experience, believed the bulge to be crack cocaine.  Id.  Upon

removing the bulge, Fulton found that it contained eighteen rocks of crack cocaine.  Id.

Johnson was subsequently arrested.  Id.

6.    Johnson moved to suppress the crack cocaine evidence prior to trial.  Id.  The district

court, without explanation, denied Johnson's motion.  Id.  Johnson was convicted at trial.

Id.  On appeal, Johnson argued that the stop was unjustified and that the frisk exceeded

the scope allowed under the Supreme Court's holding in Terry v. Ohio, 392 U.S. 1

(1968).  The United States Court of Appeals for the District of Columbia Circuit, relying

on the Supreme Court's holding in Hodari D., held that Johnson was not seized within

the meaning of the Fourth Amendment until he raised his hands and ceased making

"shoving down motions."  Id. at 1316.  The seizure, therefore, occurred after Fulton had

13

drawn his gun and ordered Johnson to raise his hands.  The seizure occurred only when

the police made a show of authority and Johnson finally submitted to it.  See Valentine,

232 F.3d at 358.

7.      In this case, the court finds that Focareta was not seized, for Fourth Amendment

purposes, until he was handcuffed by DeMarco.  After initially spotting Focareta,

DeMarco ordered him to stop walking and place his hands where DeMarco could see

them.  Focareta failed to comply.  Focareta instead walked backwards away from

DeMarco.  He continued to reach into his pants pockets as well as the pocket of his

sweatshirt.  DeMarco, having drawn his gun, ordered Focareta to place his hands on the

Lexus vehicle.  Focareta still failed to submit to the officers' authority as he continued to

make movements toward his waist and pockets.  The fact that Focareta may have

momentarily complied with DeMarco's order to place his hands on the Lexus is not

sufficient to show submission to the officer's orders.  Valentine, 232 F.3d at 359 ("Even

if Valentine paused for a few moments and gave his name, he did not submit in any

realistic sense to the officers' show of authority, and therefore there was no seizure until

Officer Woodard grabbed him.").  As a result of Focareta's failure to submit, he was

placed in handcuffs.  The court finds that Focareta did not submit to the officers'

authority.  Focareta was seized only when the police applied physical force by placing

Focareta in handcuffs.

8.      As noted, the Fourth Amendment prevents "unreasonable searches and seizures."  U.S.

CONST. amend. IV.  A seizure is usually reasonable when it is carried out with a warrant

based upon probable cause.  Katz v. U.S., 389 U.S. 347, 356-57 (1967).  A warrantless

search is presumptively invalid.  Id.  A police officer may, however, conduct a brief,

investigatory search within the parameters of the Fourth Amendment under the rule

established in Terry v. Ohio, 392 U.S. 1, 27 (1968).

> Our evaluation of the proper balance that has to be struck in
> this type of case leads us to conclude that there must be a
> narrowly drawn authority to permit a reasonable search for
> weapons for the protection of the police officer, where he
> has reason to believe that he is dealing with an armed and
> dangerous individual, regardless of whether he has probable
> cause to arrest the individual for a crime.  The officer need
> not be absolutely certain that the individual is armed; the
> issue is whether a reasonably prudent man in the
> circumstances would be warranted in the belief that his
> safety or that of others was in danger.

Id. at 27.  A Terry stop may occur only when the police officer is able "to point to

specific and articulable facts which, taken together with rational inferences from those

facts, reasonably warrant that intrusion."  Id. at 21.

9.      In Illinois v. Wardlow, the Supreme Court further explained that only reasonable

suspicion is required for a Terry stop.  528 U.S. 119, 123 (2000)("In Terry, we held that

an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop

when the officer has a *reasonable, articulable suspicion* that criminal activity is

afoot.")(emphasis added).  Reasonable suspicion is a "less demanding standard than

probable cause."  Alabama v. White, 496 U.S. 325, 330 (1990).  The level of suspicion

required for a Terry stop is "somewhat lower" and "can be established with information

that is different in quantity or content than that required for probable cause."  United

States v. Ramos, 443 F.3d 304, 308 (3d Cir. 2006).

10.     In determining whether reasonable suspicion exists, courts are instructed

15

to consider "the totality of the circumstances  – the whole picture." United States v. Sokolow, 490 U.S. 1, 8 (1989).  In Wardlow, the Supreme Court held that a district court's determination of probable cause "must be based on commonsense judgments and inferences about human behavior."  528 U.S. at 125.  The court of appeals has articulated several factors that courts may consider in determining whether reasonable suspicion exists.  The factors include: "[the suspect's] location, a history of crime in the area, [the suspect's] nervous behavior and evasiveness" as well as commonsense judgments. Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003). The court in Johnson also noted that Supreme Court precedent has, in recent years, emphasized that courts should consider police officers' unique experience and specialized training in making reasonable suspicion determinations.  Id. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

11.     The court also feels compelled to note that it may consider actions taken by Focareta after he first encountered the police and was given orders to stop and raise his hands. Consideration of that kind of conduct was specifically held to be appropriate in determining reasonable suspicion by the United States Court of Appeals for the Third Circuit in Valentine.  232 F.3d at 359.  In Valentine, the district court held that only events which occurred prior to Woodard ordering Valentine to stop could be considered in determining reasonable suspicion.  232 F.3d at 357.  The court of appeals expressly rejected that analysis.  Id. ("Because the District Court reached this issue, we think it is important to explain why that holding was *erroneous*.")(emphasis added).  The court in Valentine noted that there can be no Fourth Amendment analysis until a seizure occurs.

Id. at 358.  The court relied on prior decisions in Johnson, 212 F.3d at 1317, and United States v. Moorefield, 111 F.3d 10, 14 (3d Cir. 1997), among others, for the proposition that conduct that occurs after a police order and prior to a seizure may be considered in a district court's reasonable suspicion analysis.  Id. at 359.  "We conclude that as in Johnson and Moorefield, what Valentine did after he failed to comply with the police officers' orders can be considered in evaluating reasonable suspicion."  Id.; Johnson, 212 F.3d 1317 ("In sum, by the time the stop actually took place, it was supported by Johnson's continued furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that Johnson may have been engaged in criminal activity.").  By reason of this the court finds that Focareta was not seized until placed in handcuffs by DeMarco, conduct by Focareta prior to that seizure may be included in a reasonable suspicion analysis.

12.   The factual scenarios in Johnson, Valentine, and Moorefield and the rationale of the courts of appeals in those decisions all serve as a basis for the court's decision in this case.  As noted above, in Johnson, two police officers patrolling in a high crime area, noticed a suspect hand Johnson an object in a parking lot.  212 F.3d at 1314.  Upon approaching the car, one of the officers, Fulton, noticed Johnson make a "shoving down" motion.  Id.  Fulton, believing Johnson might be armed, drew his weapon and instructed Johnson to put his hands up.  Id.  Johnson did not comply, but instead made several more "shoving down" motions.  Id.  After finally complying, Fulton did a pat-down search of Johnson and seized crack cocaine.  Id.  The United States Court of Appeals for the District of Columbia Circuit first noted several factors that supported the minimum level

of justification needed for a <u>Terry</u> stop.  These included: Johnson's car being located in a high crime area, Fulton's observation of a woman leaning into the car and handing an object to Johnson, the woman walking away as the officers approached the car and Johnson's initial "shoving down" motion.  <u>Id.</u> at 1316.  The court of appeals noted that, if the seizure had taken place at that point, "we doubt very much whether it would have been valid."  <u>Id.</u>  The court of appeals did find, however, that Johnson's behavior gave rise to reasonable suspicion once Johnson continued to move his hands in a "shoving down" motion after the officers had drawn their guns and made it clear to Johnson that they were police officers.  <u>Id.</u> at 1317 ("In sum, by the time the stop actually took place, it was supported by Johnson's continued furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that Johnson may have been engaged in criminal activity.").

13.   Similarly, in <u>Valentine</u>, two police officers were notified by an informant that a man was carrying a gun in the neighborhood.  232 F.3d at 352.  Within one hundred feet of the intersection where the officers met the informant, the two officers noticed a man matching the informant's description.  <u>Id.</u> at 353.  Valentine, after being approached and requested to stop, charged at the officers.  <u>Id.</u>  One of the officers wrestled with Valentine and Valentine's handgun fell to the ground.  <u>Id.</u>  The court of appeals relied upon several factors in holding that reasonable suspicion for Valentine's seizure existed.  <u>Id.</u> at 356-57. The factors included the time of day, the character of the neighborhood, a tip from an informant, and the fact that Valentine walked away as he noticed a police car approach. <u>Id.</u>

18

14.     In <u>Moorefield</u>, Officer Wiles ("Wiles") and his partner were on routine patrol in the East

Liberty Section of Pittsburgh, Pennsylvania at 10:13 p.m.  111 F.3d at 11.  During that

time, Wiles observed a car "make a right turn, cross from the right lane into the left lane

in front of traffic, almost hit an oncoming car, and then make a left turn without

signaling."  <u>Id.</u>  Because of a violation of the Pennsylvania Motor Vehicle Code, and for

no other reason, the officers required the vehicle to stop and pull over to the side of the

road.  <u>Id.</u>  The car had two occupants, a driver and Moorefield.  <u>Id.</u>  After the car was

pulled over, Moorefield attempted to exit the vehicle.  <u>Id.</u>  The officers instructed

Moorefield to remain in the vehicle and asked both passengers to show their hands at all

times.  <u>Id.</u> at 12.  Moorefield did not follow the instructions.  <u>Id.</u>  Wiles noticed

Moorefield lean back and shove something into his waist.  <u>Id.</u>  Moorefield was again

directed to show his hands.  <u>Id.</u>  Moorefield responded by pushing his upper body out of

the window.  <u>Id.</u>  He was again instructed to keep his hands in the officers' view.  <u>Id.</u>

Moorefield raised and lowered his hands several times before finally complying.  <u>Id.</u>

Wiles believed that Moorefield possessed a weapon.  <u>Id.</u>  Upon the arrival of back-up,

Wiles requested Moorefield to step out of the car.  <u>Id.</u>  Wiles conducted a pat-down

search of Moorefield and seized a pistol.  <u>Id.</u>  At trial Moorefield filed a motion to

suppress the pistol and the district court granted his motion.  <u>Id.</u>  On appeal, the United

States Court of Appeals for the Third Circuit reversed the district court.[2]  <u>Id.</u> at 14. The

court of appeals relied on Wiles' testimony of Moorefield's repeated furtive movements

_____

[2]While <u>Moorefield </u>occurred in the context of a traffic stop of a vehicle, the court of
appeals subsequently applied the <u>Moorefield </u>holding on reasonable suspicion to non-traffic
related stops by police officers in <u>Valentine</u>.  232 F.3d at 359.

and refusal to obey officer commands as sufficient to establish reasonable suspicion.  Id.

"Moorefield's furtive hand movements and refusal to obey the officers' orders constituted

suspicious behavior."  Id.

15.     The court finds that reasonable suspicion existed for DeMarco and DiMaria to perform a

Terry pat-down search of Focareta.  The court notes that Blair's has been the scene of

repeated calls to the Plum Borough police for various crimes, including, specifically, theft

of firearms.  Both DeMarco and DiMaria had either responded to calls themselves or

were aware of multiple calls emanating from Blair's regarding criminal activity.  In

addition, the stop of Focareta occurred at 2:46 a.m.  Upon first encountering Focareta,

DeMarco asked him to stop walking towards him.  Focareta immediately began placing

his hands in his pockets and around his waistband.  Upon further order to not place his

hands in his pockets, Focareta proceeded to walk backwards, away from DeMarco, and

continued to reach for his pockets.  When Focareta reached the Lexus, he was ordered by

DeMarco and DiMaria to stop reaching for his pockets and place his hands on the Lexus.

Focareta placed his hands on the Lexus, but continued to reach for his waistband and

pockets.  Only then was Focareta placed in handcuffs.[3]  Both DiMaria and DeMarco

---

[3]The use of handcuffs during a Terry stop does not necessarily transform an investigative
stop into full custodial arrest "when the circumstances warrant such measures."  United States v.
Padilla, No. 96-606-03, 1997 U.S. Dist. LEXIS 3911 at *20-22 (quoting United States v.
Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1993)(holding that the use of handcuffs can be
reasonably warranted during a Terry stop.).  In addition, several courts of appeal have specifically
held that the use of handcuffs does not necessarily turn a Terry stop into an arrest under the
Fourth Amendment.  United States v. Saffeels, 982 F.2d 1199, 1206 (8th Cir. 1992)  United
States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993); United States v. Esieke, 940 F.2d 29,
36 (2d Cir. 1991); United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989); United States
v. Kapperman, 764 F.2d 786, 790n.4 (11th Cir. 1985).  The United States Court of Appeals for
the Third Circuit held in United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995), that police

testified that, in their experience, suspects frequently kept weapons around their waistbands. The fact that Focareta continued to reach into that area only serves to support the officers' suspicion. The court finds, given the time of day, the multiple reports emanating from Blair's about criminal activity, including the theft of firearms, and most importantly, Focareta's repeated furtive gestures and failure to follow officers' orders, that reasonable suspicion existed for the officers' <u>Terry</u> stop of Focareta.

16.    The search of Focareta also contained no constitutional defects. When making a <u>Terry</u> stop, an officer is permitted to make a limited protective sweep for weapons. <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972). The search must be limited in scope to its protective purpose. <u>Id.</u> In this case, DiMaria testified that, in his experience, suspects frequently keep weapons around their waistbands. DiMaria felt around Focareta's waist and immediately noticed a bulge on his right hip area. DiMaria testified that, based on his training and experience, the bulge felt like the handle of a pistol. The court finds that the search of Focareta was limited in scope to a sweep for weapons and lawful under <u>Terry</u> and its progeny.

---

officers did not transform a <u>Terry</u> stop into an arrest when they blocked in a defendant's car or when they approached the car with a barking police dog. Originating with <u>Terry</u>, courts have recognized that <u>Terry</u> stops can be used to protect police officer safety. 392 U.S. at 23-24 ("American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded .... In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves..."). In the circumstances of this case, the court finds that, due to both Focareta's and Mazur's continued furtive movements to an area of the body known by law enforcement to be a prime spot for suspects to hide weapons, the use of handcuffs during the officers' <u>Terry</u> stop of Focareta was appropriate for officer safety.

21

17.     Finally, the court must consider the seizure of the pipe and the baggie of marijuana from

Focareta by DiMaria.  The court finds that the pipe was lawfully seized pursuant to the

"plain view" exception to the warrant requirement of the Fourth Amendment.  The "plain

view" exception was first recognized by the Supreme Court in <u>Coolidge v. New

Hampshire</u>, 403, U.S. 443, 465 (1971).  The doctrine has three essential elements.  The

elements are: first, the police must not be in violation of the Fourth Amendment when

they discover the items seized; second, that the discovery of the items was inadvertent;

and third, that the incriminating nature of the items was readily apparent.  <u>United States v.

Meyer</u>, 827 F.2d 943, 945 (3d Cir. 1987).  The court finds that all three requirements are

met in this case.  First, the court has already held that the police performed a lawful <u>Terry</u>

stop on Focareta.  Second, the discovery of the pipe was inadvertent in that DiMaria, in

searching for weapons and using his flashlight, noticed the reflection of the glass pipe in

Focaretra's sweatshirt.[4]  Third and finally, DiMaria testified that he immediately

recognized the pipe as the type often used to smoke marijuana and thus the incriminating

nature of the item was readily apparent.  Under these circumstances the pipe was lawfully

seized pursuant to the plain view exception to the warrant requirement of the Fourth

Amendment.

18.     With regard to the baggie of marijuana, DeMaria, who had smelled a strong odor of

marijuana about Focareta, in reaching for the pipe pulled out the baggie with the pipe

from within the pocket of Focareta's sweatshirt.  DiMaria felt the baggie due to his lawful

---

[4]The use of a flashlight does not impact the legality of a search pursuant to the plain view
exception to the warrant requirement of the Fourth Amendment.  <u>United States v. Dunn</u>, 480
U.S. 294 (1987).

reach for the pipe that was in plain view and suspected that the baggie contained marijuana – a suspicion that reasonably arose from the strong odor of marijuana around Focareta's person and the presence of the glass pipe.  It is certainly common for baggies containing marijuana to be found in conjunction with pipes used to smoke marijuana.

19.   The seizure of the baggie containing marijuana met the three prong requirements of the plain view doctrine.  First, the law enforcement officer was lawfully reaching for the pipe when he felt the baggie and thus was lawfully in the place where he discovered the baggie of marijuana.  Second, the discovery of the baggie was inadvertent.  The officer was reaching for the pipe when he felt the baggie.  Third, the incriminating nature of the baggie was immediately apparent due to the strong odor of marijuana around Focareta and the presence of the pipe.  The court finds that the baggie containing suspected marijuana, pulled out of a pocket along with a pipe that was readily apparent, was lawfully seized pursuant to the plain view exception to the warrant requirement of the Fourth Amendment.

**III.      Conclusion**

For the above reasons, defendant's motion to suppress is **DENIED**.  An appropriate order will be issued.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: July 25, 2006


cc:     Counsel of Record

24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )
                               )
              v.               )        Criminal No. 05-227
                               )
JOHN FOCARETA,                 )
              Defendant.       )

## **ORDER**

    **AND NOW**, this 25th day of July 2006, upon consideration of defendant's motion to suppress (Docket No. 21), the government's response thereto, the evidence and arguments presented to this court at the April 3, 2006 and April 12, 2006 suppression hearings, and the proposed findings of fact and conclusions of law filed by both parties, **IT IS HEREBY ORDERED** that, in accordance with this court's Findings of Fact and Conclusions of Law filed herewith, defendant's motion to suppress is **DENIED**.

                               By the court:


                               /s/ Joy Flowers Conti
                               Joy Flowers Conti
                               United States District Judge


cc:     Counsel of Record